UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT K. BECKER,

           Petitioner,

                                      CASE NO. 2:10-CV-12017

    v.                              JUDGE ARTHUR J. TARNOW

                                      MAGISTRATE JUDGE PAUL J. KOMIVES

MICHAEL W. CURLEY,

           Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C.    *Concurrent Sentencing Doctrine* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     E.    *Collateral Estoppel (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     F.    *Other Acts Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     G.    *Special Prosecutor (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     H.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . 29
          1.     *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
          2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*      *      *      *      *

I.     RECOMMENDATION: The Court should deny petitioner's application for the writ of

habeas corpus and should deny petitioner a certificate of appealability.

_____

[1]By Order entered this date, Michael W. Curley has been substituted in place of Willie O. Smith as the proper respondent in his action.

II.   <u>REPORT</u>:

A.   *Procedural History*

    1.   Petitioner Robert K. Becker is a state prisoner, currently confined at the Baraga

Maximum Correctional Facility in Baraga, Michigan.

    2.   On June 26, 2007, petitioner was convicted of first degree criminal sexual conduct,

MICH. COMP. LAWS § 750.520b(1)(b)(iii), following a jury trial in the Montmorency County Circuit

Court.  On August 2, 2007, he was sentenced to a term of 9-20 years' imprisonment.[2]

    3.   Petitioner filed a delayed application for leave to appeal in the Michigan Court of

Appeals raising, through counsel, the following claims:

    I.    THIS MONTMORENCY TRIAL WAS BARRED UNDER THE DOCTRINE OF COLLATERAL ESTOPPEL BECAUSE THERE WAS A VALID FINAL JUDGMENT ON THE ISSUE IN A DIFFERENT CAUSE OF ACTION BETWEEN THE SAME OR LIKE PARTIES IN GRAND TRAVERSE COUNTY.

    II.    DEFENDANT WAS DENIED DUE PROCESS WHEN THE PROSECUTOR WAS PERMITTED TO INTRODUCE THE TESTIMONY OF TWO WITNESSES WHO GAVE HIGHLY INFLAMMATORY, MINIMALLY PROBATIVE, OTHER ACTS TESTIMONY.

    III.    DEFENDANT'S CONVICTION MUST BE REVERSED WHERE AN ASSISTANT PROSECUTOR FROM ANOTHER COUNTY WHO TRIED THIS CASE, WHERE HER ASSISTANCE WAS PROCURED CONTRARY TO THE REQUIREMENTS OF MCL 776.18, AND WHERE SHE WAS INTERESTED AS AN ATTORNEY IN ANOTHER CASE INVOLVING THE SAME PARTIES, FACTS AND CIRCUMSTANCES.

The court of appeals denied petitioner's application for leave to appeal in a standard order, "for lack

---

    [2]Upon the reading of the jury's verdict, petitioner fled the courtroom to his car, retrieved a shotgun, and fired at a sheriff's deputy who pursued him.  The shotgun misfired, and petitioner was apprehended.  In a separate case based on these events, petitioner was convicted of assault with intent to commit murder, being a felon in possession of a firearm, escape, resisting and obstructing a police officer, and possession of a firearm during the commission of a felony.  Petitioner's instant application does not challenge these convictions.

of merit in the grounds presented." *People v. Becker*, No. 285858 (Mich. Ct. App. Oct. 30, 2008).

    4.    Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Becker*, 483 Mich. 962, 763 N.W.2d 916 (2009).

    5.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on May 19, 2010. As grounds for the writ of habeas corpus, he raises the three claims that he raised in the state courts.

    6.    Respondent filed his answer on October 13, 2010. He contends that the court should decline to review petitioner's claims under the concurrent sentencing doctrine. Alternatively, he contends that petitioner's claims are without merit.

    7.    Petitioner filed a reply to respondent's answer on February 8, 2011.

B.    *Factual Background Underlying Petitioner's Conviction*

    Petitioner's conviction arises from his sexual assault of MG, a minor whom he at times cared for. The evidence adduced at trial is accurately summarized in respondent's answer:

> Charles Zuke worked at Pineview Homes, a residential treatment center for boys in Evart, Michigan, as a social worker. (I, 156, 160). MG was sent there on June 15, 2004, by the Michigan juvenile court for behavior modification treatment because of incorrigibility at home and stealing at school. (I, 156-157, 161). During part of MG's 12-month treatment program, he met with Zuke weekly. (I, 156-157).
>
> During his treatment at Pineview, MG's mother had been to visit him and brought Petitioner along. (I, 157-158). Zuke found that unusual because normally only parents were allowed to visit. (I, 158). During their July 14th meeting, Zuke asked MG who Petitioner was and MG mentioned various activities he had done with Petitioner, adding that Petitioner touched him. (I, 158). When Zuke asked whether Petitioner had touched MG's shoulder, MG responded: "No, [he] touched my privates." (I, 163). Zuke did not probe further, but instead, reported what MG told him. (I, 158-159).
>
> Montmorency County Sheriff Douglas Baum testified that he was contacted by Grand Traverse County Sheriff's Department Detective Pat Erway in August, 2004, about taking photographs of Petitioner's parents' house. (I, 168). Petitioner

3

was there and agreed that the sheriffs could take some photographs. (I, 169-170).

Karen Young, MG's grandmother, testified that she lived with MG, his brothers RG and BG, and their parents Mike and Liz in a two-bedroom house. (I, 171-174, 176). In the summer of 2001 or 2002, when Young's husband was alive, she, her husband and MG purchased a telescope from Petitioner during a trailer park yard sale. (I, 173-174, 177). Petitioner commented that MG was a "nice . . . young man." (I, 173, 177-178). Young told him that MG was having one of his good days and that he was usually "off the wall" because he had Attention Deficit Disorder (ADD) or Attention Deficit Hyperactivity Disorder (ADHD). (I, 173, 178). Petitioner volunteered that he worked with kids like that and offered to help Young's daughter apply for respite care if she wanted to. (I, 173, 178). Young's daughter contacted Petitioner and he came over to help fill out the paperwork. (I, 174).

Thereafter, Petitioner took MG and his younger brothers places – sometimes as a group and, other times, individually. (I, 174, 180). Young noticed that MG would become upset if Petitioner took one of his brothers alone, but never said why. (I, 175, 181).

After MG was sent to Pineview, Petitioner insisted that he visit MG. (I, 182). When the family took Petitioner, MG was cool toward him. (I, 182-183).

MG's father confirmed that Petitioner provided respite care for his family. (I, 237-238, 241-242). At times, Petitioner would have MG alone. (I, 243). MG's father knew that Petitioner took MG to Atlanta in Montmorency County. (I, 245).

Grand Traverse County Sheriff's Department Detective Todd Heller took over this case from Pat Erway, who left the Sheriff's Department after sustaining a severe head injury in a motorcycle crash. (I, 247, 250-251). Heller seized Petitioner's computer and thumb drive, but could not get into his encrypted files. (I, 248-250, 256). In fact, even though the Federal Bureau of Investigation could have obtained Petitioner's encrypted files, it declined to do so because it would have been required to divulge national security secrets in describing the process used. (I, 248-250, 256).

However, Heller did obtain Petitioner's employer's records, showing when he worked with MG and his brothers. (I, 251). Those records showed that Petitioner provided respite care as follows:

| DATE | TIME | HOURS | CHILD WATCHED |
|------|------|-------|---------------|
| 7/5/02 | 11:30-5 | 5½ | MG |
| 7/6/02 | 1-4 | 3 | BG and RG |
| 7/11/02 | 2:30-6 | 3½ | MG, BG and RG |
| 7/27/02 | 3 or 3:30-midnight | 9 | MG, BG and RG |
| 7/28/02 | midnight-12 or 12:30 | 12 | MG, BG and RG |
| 8/8/02 | 3:30-7:30 | 4 | MG, BG and RG |
| 8/16/02 | 1-midnight | 11 | MG |
| 8/17/02 | midnight-midnight | 24 | MG |
| 8/18/02 | midnight-3:30 | 15½ | MG |
| 8/19/02 | 12:30-3:30 | 3 | BG |
| 8/22/02 | 3-6 | 3 | RG |

4

| | | | |
|---|---|---|---|
| 10/11/02 | 7-midnight | 5 | MG |
| 10/12/02 | midnight-2 | 14 | MG |
| 11/3/02 | 2:30-6 | 3½ | MG, BG and RG |
| 11/8/02 | 1:30-5 | 3½ | MG and RG |
| 11/9/02 | 11:30-6 | 4½ | MG and another child |
| 11/24/02 | 1-5:30 | 4½ | MG, BG and RG |
| 12/8/02 | 1:30-5:30 | 4 | MG and another child |
| 12/15/02 | 1-5:30 | 4½ | MG and RG |
| 12/23/02 | 1:30-5 | 3½ | BG |
| 12/30/02 | 11-6:30 | 7½ | MG |
| 12/31/02 | 9:30-2 | 4½ | MG, BG and RG |
| 1/12/03 | 12:30-4 | 3½ | BG and RG |
| | 12:30-6 | 5½ | MG |
| 3/12/03 | 5-9:30 | 4½ | MG |
| 3/16/03 | 1-5:30 | 4½ | MG, BG and RG |
| 4/3/06 [sic? 2003] | 11-5 | 6 | MG |
| 5/9/03 | 7-midnight | 5 | MG |
| 5/10/03 | midnight-midnight | 24 | MG |
| 5/11/03 | midnight-5:30 | 17½ | MG |
| 7/6/03 | 12:30-5:30 | 4 | BG and RG |
| 7/7/03 | 11-5:30 | 6½ | MG |
| 8/8/03 | 1-6 | 5 | MG, BG and RG |
| 8/15/03 | 11:30-6 | 6½ | MG, BG and RG |
| 8/25/03 | 1-6 | 5 | BG and RG |
| 8/26/03 | 7-midnight | 5 | MG |
| 8/27/03 | midnight-2 | 14 | MG |
| 9/27/03 | 11-3 | 4 | MG, BG and RG |
| 11/8/03 | 12:30-5 | 4½ | MG |
| 11/30/03 | 1:30-5:30 | 4 | MG, BG and RG |
| 12/21/03 | 12:30-5:30 | 5 | MG, BG and RG |
| 1/18/04 | 2-5:30 | 3½ | MG, BG and RG |
| 2/7/04 | 1-4:30 | 3½ | BG and RG |
| 2/8/04 | 2-6 | 4 | MG |
| 2/13/04 | 6-9:30 | 3½ | MG, BG and RG |
| 3/20/04 | 12:30-5:30 | 5 | MG, BG and RG |
| 5/14/04 | 7-midnight | 5 | MG |
| 5/15/04 | midnight-midnight | 24 | MG |
| 5/16/04 | midnight-5 | 17 | MG |

(II, 313-327). Appendix A [Note: MG's full name has been replaced with his initials].

MG then testified that he was 18, having been born on February 18, 1989. (I, 184, 195-196). MG's brother RG was 13 and his brother BG was 10. (I, 185). MG was taking Strattera for his ADHD, Zoloft and Melatonin, which helped him sleep. (I, 185-186).

5

MG identified Petitioner as his respite worker. (I, 187). Petitioner served in that role for eighteen months. (I, 187). Petitioner would take him out at least once a week. (I, 188). At times, Petitioner would take MG alone; on other occasions, Petitioner would take MG, RG and BG. (I, 188).

MG considered Petitioner a friend. (I, 188, 225).

After knowing Petitioner for about a month or two, Petitioner initiated oral sex. (I, 188, 191, 212). Petitioner began by asking MG to remove his clothes. (I, 189, 191). Petitioner would then cover MG's eyes with a bandana. (I, 189, 216-217). Petitioner would tie MG spread eagle to the bed posts, either face up or down. (I, 189-190). Petitioner would then kiss MG and hump him. (I, 190). Petitioner would end by ejaculating on MG's back or stomach. (I, 190). Petitioner would then wipe MG down. (I, 190).

Petitioner also took pictures of MG. (I, 192-193).

Two or three times, Petitioner took MG, who lived in Traverse City in Grand Traverse County, to Atlanta in Montmorency County by himself and they stayed there overnight. (I, 184, 193-196). After MG's 15th birthday, but before he went to Pineview, MG and Petitioner went to Atlanta for the last time; they were playing a computer game when Petitioner asked MG to come to a room and strip. (I, 195-196, 202, 215, 233, 236). Petitioner then tied MG to the bed facedown and blindfolded him. (I, 196).

MG heard a drawer open and, then, smelled Vasoline. (I, 196, 198). Petitioner put his finger in MG's butt. (I, 197). MG turned around, swore at Petitioner and told him that he didn't like it. (I, 197). MG was moving around so much that Petitioner stopped because he was afraid he would hurt MG. (I, 197).

MG did not recall previously testifying that the digital-anal penetration occurred in Grand Traverse County. (I, 210). However, he later admitted that he had previously testified that it happened in Traverse City in Grand Traverse County, but, then, he changed his testimony, stating it happened in Atlanta in Montmorency County. (I, 216, 219).

MG further admitted that he had previously testified that he wasn't tied down in Atlanta and that no bandana was used. (I, 230-231).

Five photographs of MG at Petitioner's parents' house in Atlanta in Montmorency County were admitted; in four of the photographs, MG was not wearing a shirt. (I, 201-203).

Later, Petitioner and MG went star gazing and Petitioner asked if MG wanted to tell him anything. (I, 197). MG told Petitioner that he wanted to stop. (I, 197).

MG later went to Pineview because he was stealing. (I, 205-206). MG told Zuke about what happened with Petitioner, but not in detail. (I, 204-205).

Detective Erway came to talk to MG. (I, 203-205).

MG did not remember seeing any scars on Petitioner's body. (I, 212-213).

MG admitted that he had earlier testified that he first met Petitioner in 2003. (I, 221). MG admitted that he previously testified during the Grand Traverse County proceedings that he couldn't distinguish the truth from his own stories. (I, 227-228). MG denied fabricating any testimony during the Montmorency County trial. (I,

228-230). MG denied making anything up in Grand Traverse County, testifying that he was merely confused about the dates. (I, 232).

Raymond Leavitt then testified that he was born on January 3, 1976. (II, 270). Leavitt, who was hearing impaired, met Petitioner when Leavitt was 14 or 15. (II, 263, 271, 347). Leavitt's father was not around and he lived with his mother. (II, 264). Leavitt took karate lessons from Petitioner at Petitioner's trailer. (II, 264).

Leavitt ran away from home and went to Petitioner's trailer. (II, 265-267). Petitioner manually stimulated Leavitt's penis until Leavitt, who was 15, ejaculated. (II, 266-267, 273-274, 277).

In 1994, Leavitt broke into Petitioner's house, stealing a gun from a room that Petitioner had never allowed him to enter. (II, 268, 271, 274-275, 277-278). Leavitt buried the gun and re-entered Petitioner's trailer to get ammunition. (II, 275-276). Leavitt was going to shoot Petitioner. (II, 268, 276). Leavitt knew that Petitioner "was doing it to other kids." (II, 276).

After Leavitt was arrested, he disclosed what had happened to a detective, but nothing happened. (II, 269, 276-277).

In 2004 or 2005, Leavitt was in jail for attempted felonious assault. (II, 272). Leavitt saw Petitioner there and asked his mother why Petitioner was in jail. (II, 272-273). When Leavitt's mother told him, he talked to a detective because he thought that someone would now believe him. (II, 267, 269, 273).

Leavitt did not know MG. (II, 269).

Andrew Pawloski testified that he was born on October 3, 1977. (II, 279, 289). Pawloski's parents were divorced. (II, 280). Petitioner was training Pawloski in martial arts. (II, 279-280). Pawloski spent the night twice at Petitioner's because Petitioner lived closer to the YMCA where they trained than Pawloski did. (II, 280-281).

One night, Petitioner told Pawloski to sleep in his bed. (II, 281). Thereafter, Petitioner came in, rubbed up against Pawloski, fondled him and told him that he wanted "to get his rocks off." (II, 281-282). Pawloski did not understand what Petitioner was talking about, but went along with it. (II, 282). Petitioner "finished up" and, later, Pawloski went to sleep on the couch. (II, 282). That was the last time, Pawloski spent the night. (II, 282).

Pawloski disclosed what Petitioner had done after Pawloski was accused of touching a younger boy he was babysitting. (II, 282-283, 286-288).

In 1992, Pawloski testified against Petitioner. (II, 284).

Pawloski did not know MG. (II, 283).

Twenty-one year-old Austin Daigh testified for Petitioner, who was his respite worker after Daigh was 12. (II, 303-304). Petitioner took Daigh shopping, let him look through his telescope and allowed him to play on Petitioner's computer. (II, 301, 305).

Petitioner testified his parents' house was in Montmorency County. (II, 307). Petitioner lived in Traverse City in Grand Traverse County. (II, 307). Petitioner admitted that he took MG to his parents' house three times. (II, 308).

Petitioner provided respite care for approximately ten years beginning in

1994. (II, 309). Petitioner had to undergo a background check before he could be a respite worker. (II, 309-310).

In June, 2002, Petitioner met MG and his grandparents at the trailer park garage sale. (II, 312). Petitioner agreed to help them set up the telescope. (II, 312).

Petitioner helped MG's mother complete the paperwork necessary to obtain respite care, but she had already signed up. (II, 311). In filling out the paperwork, MG's mother reported that MG had a problem with lying. (II, 311-312). Petitioner was concerned because, in his experience, kids that lied also stole. (II, 312).

By Petitioner's tally, he had MG alone for 13 respites. (II, 327). MG spent the night five times, including the nights of May 14, 15 and 16, 2004, when MG was 15, and before MG went to Pineview. (II, 327, 340).

Although Petitioner visited MG at Pineview, he did so at MG's mother's request. (II, 327-328). According to Petitioner, Young was not present. (II, 329). During that visit, Petitioner got a chance to talk to MG alone. (II, 330). Petitioner told MG that he was no longer welcome at Petitioner's mother's house because he stole something there. (II, 330). MG "was furious." (II, 330-331).

Petitioner also testified that Leavitt had fetal alcohol syndrome. (II, 331). Petitioner did not teach Leavitt karate. (II, 331). Leavitt broke into Petitioner's house and stole a gun. (II, 331).

Petitioner admitted that he gave Pawloski karate lessons, but Petitioner denied sexually assaulting Pawloski, Leavitt or MG. (II, 332).

Petitioner showed the jury his surgical scar, which extended from his belly button to above his pubic area. (II, 333-334). A medical record dated May 3, 2005, confirmed that Petitioner had a scar. Appendix C.

Brenda Turner testified that she provided respite care for the same agency as Petitioner. (II, 342-343). Turner had known Petitioner for 27 years because his father was the best man at her wedding. (II, 344). Turner opined that Petitioner was an honest person. (II, 345).

Answer, at 4-12 (footnotes omitted); *see also*, Pl.-Appellant's Delayed Application for Leave to App, in *People v. Becker*, No. 285858 (Mich. Ct. App.), at 2-5.

C.    *Concurrent Sentencing Doctrine*

Respondent first contends that the Court should decline to review the merits of petitioner's claims under the concurrent sentencing doctrine, because he is currently serving several concurrent prison terms longer than the term imposed for the conviction involved in this case.  The Court should reject this argument.

Under the "concurrent sentencing doctrine," a "court may decline to hear a substantive

8

challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction." *Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989); *see also*, *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992). The doctrine is a discretionary one, *see Hughes*, 964 F.2d at 541, and courts "are admittedly hesitant to apply this doctrine." *Dale*, 878 F.2d at 935 n.3; *see also*, *Winn v. Renico*, 175 Fed. Appx. 728, 732 (6th Cir. 2006)..   The doctrine is applicable only "when there is *no possibility* of adverse 'collateral consequences' if the convictions stand." *Winn*, 175 Fed. Appx. at 732 (emphasis added); *see also*, *Dale*, 878 F.2d at 935 n.3; *Wilson v. Straub*, 185 F. Supp. 2d 766, 769 (E.D. Mich. 2002) (Hood, J.).   The Court should presume that petitioner's conviction carries adverse collateral consequences, *see Wilson*, 185 F. Supp. 2d at 769-70 (citing *Sibron v. New York*, 392 U.S. 40, 55 (1968)); *see also*, *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that the Court generally presumes that a criminal conviction carries adverse collateral consequences beyond the sentence imposed), and respondent bears a heavy "burden of showing that the risk of collateral consequences is too slight to justify review." *Suarez v. Bennett*, 207 Fed. Appx. 114, 115 (2d Cir. 2006).   The concurrent sentence doctrine is not jurisdictional–that is, the existence of concurrent sentences does not render a challenge to one sentence moot and therefore outside the Court's jurisdiction.   *See United States v. Williams*, 128 S. Ct. 1830, 1838 n.1 (2008); *Benton v. Maryland*, 395 U.S. 784, 791 (1969).

As noted in *Dale*, there must be "*no* possibility of adverse 'collateral consequences'" before the concurrent sentencing doctrine will be applied. *Dale*, 878 F.2d at n.3 (emphasis added). Here, it cannot be said that there is *no* possibility of adverse consequences. There is a possibility, however slight, that petitioner's other convictions here will no longer result in his imprisonment. However

unlikely, it remains possible that his other convictions could be overturned in a subsequent state postconviction or federal habeas proceedings, or that petitioner could obtain clemency or pardon on these convictions. Prior to adoption of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996), such slight possibilities of collateral consequences could be adequately accounted for by dismissing the petition pursuant to the concurrent sentencing doctrine, but making such a dismissal without prejudice to the petitioner refiling his or her application should the unlikely collateral consequences occur. For example, this was the course taken by the court in *Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991). However, even if this Court were to take the approach of the *Scott* court, application of the concurrent sentencing doctrine to petitioner's application will have the effect of forever precluding petitioner from challenging this conviction, even if the greater sentence is commuted or otherwise becomes invalid, due to the one year limitations period of the AEDPA. 28 U.S.C. § 2244(d)(1). Accordingly, the Court should decline respondent's invitation to apply the concurrent sentence doctrine.

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the

11

Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

The deferential standard of review set forth in § 2254(d) applies even though the Michigan Court of Appeals did not issue a reasoned decision. As the Supreme Court has explained, an unexplained summary order by a state court is presumed to be a rejection of the claims on the merits, and the petitioner bears the burden of demonstrating that the rejection was on some basis other than the merits. *See Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011). Here, there is no indication that the Michigan Court of Appeals denied petitioner's application for leave to appeal on any basis

12

other than the merits.  On the contrary, the court of appeals explicitly stated that its denial was "for lack of merit in the grounds presented," and the Michigan Court of Appeals has repeatedly held a denial on this basis is "a determination on the merits of the case."  *Attorney Gen'l ex rel. Dep't of Treasury v. Great Lakes Real Estate Investment Trust*, 77 Mich. App. 1, 3, 257 N.W.2d 248, 249 (1977); *accord Hoye v. DMC/WSU*, No. 285780, 2010 WL 334833, at *1 (Mich. Ct. App. Jan. 28, 2010) (per curiam); *McCabe v. Miller & Assocs., L.L.P.*, No. 275498, 2007 WL 2935032, at *3 (Mich. Ct. App. Oct. 9, 2007) (per curiam); *People v. Douglas*, 122 Mich. App. 526, 530, 332 N.W.2d 521, 523 (1983).  Accordingly, the Michigan Court of Appeals's denial of petitioner's application for leave to appeal "for lack of merit in the grounds presented" constitutes an adjudication on the merits for purposes of § 2254(d).  *See Snyder v. Lafler*, No. 09-13773, 2011 WL 309056, at *3 (E.D. Mich. Jan. 27, 2011) (Roberts, J.).

E.      *Collateral Estoppel (Claim I)*

Petitioner first contends that his conviction runs afoul of the collateral estoppel bar imposed by the Double Jeopardy Clause.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

        1.      *Clearly Established Law*

The Fifth Amendment to the United States Constitution commands that no "person be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  The Double Jeopardy Clause, which is applicable to the states through the Due Process Clause of the Fourteenth Amendment, *see Benton v. Maryland*, 395 U.S. 784, 794 (1969), provides three basic protections: "[It] protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against

13

multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (footnotes omitted). The Supreme Court has further "held that collateral estoppel in criminal trials is an integral part of the protection against double jeopardy guaranteed by the Fifth and Fourteenth Amendments." *Harris v. Washington*, 404 U.S. 55, 56 (1971) (per curiam) (citing *Ashe v. Swenson*, 397 U.S. 436, 443 (1970); *Benton*, 395 U.S. 794); *see also, Yeager v. United States*, 557 U.S. 110, 129 S. Ct. 2360, 2366-67 (2009); *Dowling v. United States*, 493 U.S. 342, 347-48(1990). The Court explained that "collateral estoppel 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Harris*, 404 U.S. at 56 (quoting *Ashe*, 397 U.S. at 443). Under this rule, "[a] fact previously determined in a criminal case is not an 'ultimate fact' unless it was necessarily determined by the [fact finder] against the government and, in the second prosecution, that same fact is required to be proved beyond a reasonable doubt in order to convict." *United States v. Wells*, 347 F.3d 280, 285 (8th Cir. 2003) (internal quotations omitted). As the Supreme Court has explained, the fact determined in the prior action must have been "essential to the judgment" in that the "final outcome hinge[d] on it." *Bobby v. Bies*, 556 U.S. 825, 834-35 (2009). Where a general verdict is involved, a court must examine the record to determine "whether a rational jury could have grounded its verdicts upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444 (internal quotation omitted); *see also, Yeager*, 129 S. Ct. at 2367. "If the jury could have done so in the prior case, the claim of collateral estoppel must fail, since the defendant can prevail only if the issue which he seeks to preclude from consideration was 'necessarily' resolved in his favor in the prior proceeding." *United States v. Cala*, 521 F.2d 605, 608 (2d Cir. 1975). It is petitioner's burden to show that the issue was "necessarily decided." *See*

14

*Yeager*, 129 S. Ct. at 2368 n.6; *Dowling*, 493 U.S. at 350.

    2.    *Analysis*

The basic procedural facts relating to petitioner's collateral estoppel claim are not in dispute. Petitioner was initially bound over to the Grand Traverse County Circuit Court on seven counts of CSC-I and one count of CSC-II. The CSC-I counts included the digital/anal penetration count alleged to have occurred in the home of petitioner's father in Atlanta, Michigan, which is in Montmorency County. The Grand Traverse County court ordered the prosecution to file a bill of particulars. The prosecution did so, listing as Count 6 an allegation of digital/anal penetration occurring in Atlanta in May 2004. Prior to trial, the Grand Traverse County prosecutor dismissed three counts, including the count involving conduct in Atlanta. Petitioner ended up going to trial in Grand Traverse County Circuit Court on two counts of CSC-I and one count of CSC-II, all alleged to have occurred in Grand Traverse County. The victim was permitted at that trial to testify to the Atlanta incident as a similar act under Rule 404(b). The victim's prior statements and testimony regarding when the acts tried in Grand Traverse County occurred varied throughout the proceedings. Following the victim's testimony, petitioner moved to dismiss the charges, and the trial judge granted the motion. The court explained that date and time are material elements of the crime, and that although the prosecution need not "prove an exact date," it must prove that "the crime committed occurred reasonably near that date." Grand Traverse Trial Tr., dated 9/15/03, at 3.[3] The court also noted that the prosecution was proceeding on the basis that the remaining charge counts occurred in 2002, and did not seek an amendment of the information to allege acts occurring

---

    [3]A copy of this transcript is attached as an exhibit to petitioner's brief in the Michigan Supreme Court, as well as to petitioner's habeas application.

in 2003.  *See id*. at 4.  The court then explained the inconsistencies in the victim's statements and

testimony, noting that the victim ultimately insisted that the charged acts occurred in 2003, *see id*.

at 4-8, and explained that the victim admitted to having a poor memory and to "mak[ing] things up

to fill in the blank."  *Id*. at 8.  The court then concluded that the prosecution could not prove beyond

a reasonable doubt that the acts charged occurred at the times alleged, being careful to note that it

was making no finding that the acts did not occur.  Because the Court is faced with the task of

deciding what "ultimate facts" were actually determined by the Grand Traverse County court, it is

appropriate to quote the judge's ruling at length:

> It is not simply the statements with regard to the actual sexual behavior that
> are important in supporting a conviction, the year is also an element.
>   For purposes of this motion, the Court has to assume most favorably from the
> People's point of view that there is evidence in this record that the defendant is a
> predatory pedophile.  That's an assumption, the defendant is a predatory pedophile.
> In fact, the predatory nature comes from calling out [sic] from the herd of
> individuals, like Mr. Leavitt and this complaining witness, who have difficulties with
> the court system and who aren't likely to be believed when they come to court.  The
> defendant has been through a prior trial of a similar nature with a young person,
> who's proposed as a 404b witness.  Here, while the 404b evidence is important, in
> terms of establishing the behavior occurred, that's not the basis for this motion.
>   For this motion, the Court would assume that the behavior occurred.  The
> issue is, can you prove that behavior occurred in a given year.  And, for a person of
> this age and this intelligence who has been through a preliminary examination, who
> has testified under oath with regard to dates, who has had multiple opportunities, and
> has engaged in them, to meet with law enforcement and the police who have caused
> the information to be amended and working on an information amended literally the
> morning trial began; to then have that individual change those dates to a later year
> and reject his prior testimony under oath; the Court then has to ask the question, can
> a reasonably honest jury accept the testimony of this witness?  Can a rational jury
> accept the testimony of this witness as to the date?  Assuming that the witness would
> testify that a garage sale occurred in 2002, and that the defendant met the
> complaining witness in the summer of 2002, that doesn't make the events occur in
> 2002.  Indeed, the defendant's own records indicate, Exhibit 2 would indicate, they
> met in the summer of 2002.  The witness testified on that point that this occurred
> within a year of meeting the defendant.  So he may have said something earlier.
> What he said under oath yesterday is this occurred within a year of meeting the
> defendant.  He said a number of different things with regard to the date, but the

consistency of his testimony was it was in 2003.  The evidence that's proposed, whether it's garage sale evidence about when the defendant actually met the complaining witness, or whether its 404b evidence, the 404b evidence goes to was there sexually inappropriate contact.  But for this motion, the Court assumes there is evidence of those elements.

The question is, is there evidence that can be believed by a rational jury that the behavior occurred in 2003 [sic–2002]?

Now, the defendant's own records that are before the Court indicate there were contacts, regular contacts, from 2002 to 2004.  It's not as though 2003 wasn't a possible option.  It's not as though this witness couldn't have said, no, this occurred in 2003 before the 8th grade, when I was 14, just as he said here in Court.  But after multiple meetings with police and law enforcement he rejected that prior testimony, said it was false.  It was material evidence he did not express at the time of the prelim.  In the transcript the Court's reviewed, there did not appear to be any confusion, any hesitation to provide a date.  He appeared to be as certain and direct about 2002 at the prelim as he was here.

So now we are left with only one logical conclusion, that either at the preliminary examination, or in Court here, out of a desire to please, out of a desire to fill in blanks for people, this witness has on one of those two occasions provided material false testimony on a key element in this criminal prosecution.  And in this Court's view, that can't be filled in somewhere else.

The time and contact with the defendant clearly covered a three year period, or parts of three separate years, including 2003.  And the witness, the complaining witness, the only witness who knows what he believes happened to him, says it occurred in 2003.  It's a totally different year than that alleged in the information before the Court.

So the issue is not whether the jury can find the defendant committed acts in 2003.  The jury would have to find that the acts occurred in 2002, despite this witness's categorical rejection of that fact, and it would have to be based on the fact that garage sales and meetings occurred in 2002.  The complaining witness was aware of that issue, it was brought to his attention during his examination, and he still insists on 2003.

This Court cannot conceive of legally how a conviction beyond a reasonable doubt can be based on these three counts having occurred in 2002 on this record, where so clearly and categorically that year has been rejected by this complaining witness. From the moment his direct examination began, through the end of recross he has been consistent. If he has provided material false testimony in this proceeding about the year, how is a jury to support their findings with regard to 2002.  If the testimony at the preliminary examination was accurate, that's been rejected by the complaining witness.

*Id.* at 8-12.[4]

The prosecutor appealed this decision, but the appeal was dismissed for lack of jurisdiction by the Michigan Court of Appeals because any retrial on the charges would be barred by the Double Jeopardy Clause. The Michigan Supreme Court denied petitioner's application for leave to appeal. Thereafter, the Montmorency County Prosecuting Attorney filed charges against petitioner for acts alleged to have occurred in that county. At the preliminary examination, the prosecutor reduced the charges to one count of CSC-I based on digital-anal penetration which occurred in Atlanta between February 18 and July 2, 2004. Petitioner filed a motion to dismiss this count on double jeopardy grounds. The trial court denied the motion, and the Michigan Court of Appeals denied petitioner's application for leave to file an interlocutory appeal.

Petitioner, relying on *Ashe v. Swensen*, contends that both the fact that the victim was not credible and the validity of all of the sexual misconduct charges against him was necessarily determined by the Grand Traverse County court's dismissal, and thus he could not be tried on the CSC-I count on which he was convicted. The Court should conclude that petitioner is not entitled to habeas relief on this claim. As noted above, where a general verdict is involved, a court must examine the record to determine "whether a rational jury could have grounded its verdicts upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444 (internal quotation omitted); *see also*, *Yeager*, 129 S. Ct. at 2367. "If the jury could have done so in the prior case, the claim of collateral estoppel must fail, since the defendant can prevail only if the issue which he seeks to preclude from consideration was 'necessarily' resolved in his

---

[4]Both the copy of this transcript attached to petitioner's habeas application and the copy attached to his brief in the Michigan Supreme Court omit page 13, skipping from page 12 to page 14, which is the final page of the transcript. Neither petitioner nor respondent cites to anything on page 13.

favor in the prior proceeding." *Cala*, 521 F.2d at 608.  Petitioner cannot meet his burden of establishing that the issue he sought to foreclose from consideration in the Montmorency County prosecution was necessarily decided in the Grand Traverse County prosecution.

By contending that his trial in Montmorency County was completely barred by collateral estoppel, the issue that petitioner sought to preclude from consideration was whether he had committed an act of digital-anal penetration with the victim in Atlanta between February 18 and July 2, 2004.  This issue, however, was not necessarily decided in his favor in the Grand Traverse County proceedings.  Although the act forming the basis of the Montmorency County charge was introduced as Rule 404(b) evidence in the Grand Traverse County prosecution, it was not itself a charge in that case, having been dismissed before the jury was impaneled.  Further, nothing in the Grand Traverse County Circuit Court's ruling purported to decide whether petitioner had committed an act of digital-anal penetration on the victim in Montmorency County.  Indeed, the court's ruling did not even necessarily decide whether the sexual acts charged in Grand Traverse County had occurred.  On the contrary, the court assumed for purposes of its ruling that the sexual assaults had in fact occurred, an assumption that it repeated several times in making its ruling.  The only thing that the court necessarily decided was that, in light of the victim's insistent testimony at trial that the Grand Traverse County acts occurred in 2003, the prosecution could not prove beyond a reasonable doubt that the acts occurred in 2002, which the court determined was a necessary element of the offense.  And this fact was not required to be proved to sustain the charge against petitioner in the second trial.  At the second trial, the prosecution was required to prove that an act of digital-anal penetration occurred in Montmorency County sometime between February 18 and July 2, 2004.  Whether other acts of sexual penetration or sexual contact occurred between petitioner and the victim in 2002 or

19

2003, or at all for that matter, was not a fact that the prosecution was required to prove beyond a reasonable doubt at petitioner's second trial.

Petitioner appears to argue that the Grand Traverse County court necessarily determined that the victim was not credible, and this credibility finding was binding in the second trial. This argument is incorrect both factually and legally. First, factually, the Grand Traverse County court did not explicitly find the victim's testimony at the first trial incredible. The court simply noted that the victim had lied either at trial or at the preliminary examination because he gave conflicting years at trial and at the preliminary examination for when the acts occurred. The trial court's decision was not based, however, on a finding that the victim's testimony was incredible.[5] Rather, the decision was based on the victim's consistent and insistent testimony at trial that the events occurred in 2003, not 2002 as alleged by the prosecution. Second, legally, the credibility of a witness is not an "ultimate fact" to which collateral estoppel applies. To be sure, a finding that a witness was not credible in a specific respect may establish that specific fact (or, rather, the opposite of that specific fact) for purposes of collateral estoppel, but it does not compel a conclusion that the witness is forever-after unable to offer any credible testimony in a court proceeding. "[C]redibility determinations are not an all-or-nothing proposition," *United States v. Cassidy*, 6 F.3d 554, 557 (8th Cir. 1993), and even within a single case the fact-finder "is free to believe part and disbelieve part of any witness's testimony." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009); *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 196 n.9 (5th Cir. 1992); *United States v. Prince*, 883 F.2d 953,

---

[5]Indeed, to presume that the trial court based its decision on the victim's credibility would be to presume that the trial court acted contrary to Michigan law, as under Michigan law "it is not permissible for a trial court to determine the credibility of witnesses in deciding a motion for a directed verdict of acquittal, no matter how inconsistent or vague that testimony might be." *People v. Mehall*, 454 Mich. 1, 6, 557 N.W.2d 110, 113 (1997).

959 n.3 (11th Cir. 1989). Here, the most that can be said is that the Grand Traverse County judge found that the victim was not credible with respect to the date that the alleged Grand Traverse county offenses occurred. This credibility finding implies no associated finding that the victim's testimony was not credible with respect to the date of the Montmorency County offense. Nor does it imply an associated finding that the victim's testimony was not credible with respect to whether any of the sexual assaults had occurred, a conclusion confirmed by the fact that the court, for purposes of its ruling, expressly assumed that they had occurred. Thus, the "ultimate fact" that petitioner sought to preclude in his Montmorency County trial–whether he had committed an act of digital-anal penetration in the county in 2004–was not "necessarily determined" in the Grand Traverse County proceedings. Whether petitioner had committed an act of digital-anal penetration in Montmorency County in 2004 was simply not determined in the Grand Traverse County case, and even if it had been it would not have been "essential to the judgment" in that case nor would the "final outcome" have "hinge[d] on it." *See Bobby*, 556 U.S. at 834-35.

Although there is a relative dearth of cases addressing this precise issue, several federal and state court decisions demonstrate the reasonableness of the Michigan Court of Appeals's rejection of petitioner's collateral estoppel claim. *Cf. Price v. Vincent*, 538 U.S. 634, 643 & n.2 (2003) (concluding that state court's decision finding no double jeopardy violation was reasonable in part because "numerous other courts have refused to find double jeopardy violations under similar circumstances," and citing both federal and state cases in support); *Owens v. Guida*, 549 F.3d 399, 422 (6th Cir. 2008) (relying on federal and state cases in rejecting petitioner's claim and noting that "a state court does not unreasonably apply clearly established federal law when it rejects an argument that has been unanimously rejected by other courts."). Directly on point is the court's

21

decision in *State v. Nocon*, 352 So. 2d 910 (Fla. Ct. App. 1977). In that case, the defendant was charged in two separate cases with sexual battery of the same child, occurring on two separate dates. The defendant was acquitted in the first trial, and the trial court ruled in the second trial that the prosecution was collaterally estopped from relying on the victim's credibility to establish that the defendant had sexual intercourse with her at any time. *See id.* at 911-12. The Florida Court of Appeals reversed, reasoning that the "ultimate fact" decided in the first trial was that the defendant did not commit the specific act charged in that case. The court reasoned that "[m]erely because the victim's testimony was not sufficiently credible to persuade a jury of appellee's guilt on that date does not of itself mean that the jury did not believe her with respect to other offenses not then being tried." *Id.* at 912. The jury's verdict, the court explained, established only that the jury did not believe that a sexual battery had occurred on the specific date alleged in the first trial; it did not "necessarily mean[] that the jury did not believe [defendant] had committed sexual battery on her at 'any' time," and it followed therefore that the verdict did not determine any "ultimate fact" relevant to the charge in the second trial. *Id. Nocon* is, in relevant respects, nearly identical to the situation in petitioner's case, and provides strong support for the conclusion that the Michigan Court of Appeals's rejection of petitioner's claim was reasonable.

The court's decision in *Commonwealth v. Cromwell*, 478 A.2d 813 (Pa. Super. Ct. 1984), is likewise on point. In that case, the defendant was charged in one case with four burglaries in Somerset County, based primarily on the testimony of several accomplices. He was acquitted on those charges, and was subsequently charged in Bedford County with several burglaries occurring in that county. *See id.* at 814. The court rejected the defendant's claim that the prior acquittal collaterally estopped the prosecutor from pursuing the charges in Bedford County, because the facts

22

found in the first trial were not relevant to the Bedford County charges and did "not prevent a jury in the latter county from making a completely separate and different inquiry." *Id*. at 816. In reaching this conclusion, the court rejected the defendant's argument that because the Somerset County jury had rejected the credibility of his accomplices in acquitting him, and because those same accomplices would testify in the Bedford County case, collateral estoppel precluded the second trial. The Court reasoned that "[c]redibility of testimony, as a general rule, is not an ultimate fact. Rather, it is an evidentiary fact which, when determined, enables the factfinder to move beyond the evidence and make findings of ultimate facts." *Id*. The court explained that the first jury's "determination that their testimony was not credible as it pertained to the Somerset County burglaries is not necessarily inconsistent with any fact which must be established for conviction of the offenses allegedly committed in Bedford County. The testimony of these witnesses will be different. It will pertain to events separate and distinct from the events which were the subject of their prior testimony." *Id*. (internal quotation and alterations omitted). So to, here, even if the Grand Traverse County court did make a credibility determination with respect to the victim regarding the Grand Traverse County charges, that finding would not have determined any fact relevant to the Montmorency County charges, because in that case the victim testified to "events separate and distinct from the events which were the subject of [his] prior testimony." *Id*.

Other decision, although not as directly on point as *Nocon* and *Cromwell*, further support this conclusion. *See United States v. Gentile*, 816 F.2d 1157, 1162-63 (7th Cir. 1987) (defendant's acquittal on charge of traveling in interstate commerce to facilitate an unlawful activity, in case in which prosecution's case was based on testimony of airlines baggage claim agents and DEA agents, did not preclude subsequent trial on charge of possessing with intent to distribute cocaine arising

from same incident.  Fact that jury acquitted defendant of the interstate travel charge "does not mean the jury completely discredited all the testimony of those five witnesses," and the jury "could have believed much or all of that testimony and still concluded that Gentile did not travel in interstate commerce."); *United States v. Jackson*, 778 F.2d 933, (2d Cir. 1985) (acquittal on drug conspiracy charge did not preclude subsequent prosecution on underlying substantive charge of possessing heroin on aiding and abetting theory, and did not preclude use of witness who testified at first trial to establish the conspiracy, because "[a] juror at the first trial could have believed all or certainly almost all of [the witness's] testimony with respect to evidentiary facts without being convinced beyond a reasonable doubt that Jackson had entered into an agreement to become a conspirator, as distinguished from forwarding the ambition of her cohabitant, Whyte.  The Government was entitled to use the same testimony in order to establish another ultimate fact–aiding and abetting–at a second trial."); *United States v. Kalish*, 690 F.2d 1144, 1155 (5th Cir. 1982) (rejecting claim that acquittal in first trial collateral estopped prosecution from using at second trial testimony of witness whose credibility, defendant claimed, was necessarily decided against the prosecution by the first jury, because in reaching its verdict the first jury "did not necessarily find that [the witness's] every statement concerning his dealings with Kalish was untrue."); *Schleiss v. State*, 239 N.W.2d 68, (Wis. 1976) (acquittal of co-defendant in which jury rejected credibility of prosecution's witness did not preclude subsequent trial of defendant based on testimony of same witness; "the credibility of [the witness's] testimony is not an ultimate issue of fact, the resolution of which would preclude further prosecution. . . .  Matters of an evidentiary nature are offered to establish the ultimate facts in issue . . . .  The weight to be attached to any particular type of evidence offered is not, in itself, an ultimate determination of fact.").  As a leading treatise puts it, these cases stand for the proposition that the

24

"ultimate fact" requirement of the collateral estoppel test "means that a defendant cannot use *Ashe* . . . to prevent a factual determination contrary to one which was not of the 'ultimate' kind in the first trial (e.g., that a certain witness was not credible)."   5 WAYNE R. LaFAVE, ET AL., CRIMINAL PROCEDURE § 17.4(a), at 73 (3d ed. 2007).

Because the Grand Traverse County court did not determine any issue of ultimate fact that the prosecution was required to prove in the Montmorency County case, the collateral estoppel aspect of the Double Jeopardy Clause did not bar either the Montmorency County charges nor the use of the victim's testimony in the Montmorency County prosecution.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[6]

## F.   *Other Acts Evidence (Claim II)*

Petitioner next claims that he was denied a fair trial by the introduction of the testimony of two witnesses, both of whom testified that petitioner had sexually assaulted them.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 1.   *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the

---

[6]Two additional points are necessary.  First, petitioner does not appear to argue that the prosecution was collaterally estopped from presenting the Grand Traverse County acts as other acts evidence in the Montmorency County prosecution.  To the extent he is making such an argument, it is foreclosed by *Dowling*, which explicitly rejected this type of claim.  *See Dowling*, 493 U.S. at 349-50.  Second, petitioner argues that by initially charging the Montmorency County acts in the Grand Traverse County prosecution and then dismissing those charges prior to trial, the Grand Traverse County Prosecutor itself made a "determination" that the victim was not credible and that the Montmorency County acts did not occur.  This argument is without merit.  Collateral estoppel is applicable only where there is a "final determination" of an issue "actually litigated" by the parties.  No such litigation and determination occurs with respect to a charge voluntarily dismissed, and thus the prosecution's voluntary dismissal of a charge "does not implicate the doctrines of res judicata or collateral estoppel."  *United States v. McDermott*, No. 95-5271, 1996 WL 433971, at *3 (10th Cir. Aug. 2, 1996); *see also*, *Best v. City of Portland*, 554 F.3d 698, 701-02 (7th Cir. 2009); *United States v. One Clipper Bow Ketch Nisku*, 548 F.2d 8, 10 n.2 (1st Cir. 1977).

25

application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).  In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

26

2.    *Analysis*

As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence.   Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial.  *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001).  In short, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence," *Bugh*, 329 F.3d at 512, and thus petitioner is not entitled to habeas relief on this claim.[7]

G.    *Special Prosecutor (Claim III)*

Petitioner also contends that his trial was fundamentally unfair because the Montmorency County Prosecutor's appointment of an assistant Grand Traverse County prosecutor to act as a special prosecutor to try his case was invalid under state law.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As noted above, it is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)

---

[7]Michigan law now explicitly allows introduction of evidence in a child sexual assault case of previous instances of child sexual assault committed by the defendant without the need to satisfy the requirements of Rule 404(b).  *See* MICH. COMP. LAWS § 768.27a.  Federal law likewise explicitly allows such evidence.  *See* FED. R. EVID. 414.  The courts have repeatedly rejected due process challenges to these and similar laws from other jurisdictions, *see, e.g.*, *United States v. Coutentos*, 651 F.3d 809, 819 (8th Cir. 2011); *United States v. LeMay*, 260 F.3d 1018, 1024-27 (9th Cir. 2001); *Ray v. Kernan*, 646 F. Supp. 2d 1102, 1123 (N.D. Cal. 2009), further supporting the conclusion that the Michigan Court of Appeals's rejection of petitioner's claim was reasonable.

("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Petitioner contends that the appointment of the special prosecutor violated MICH. COMP. LAWS §§ 49.160 and 776.18. At the outset, it is not clear that there was any violation of state law. Section 49.160 deals with another party seeking disqualification of a prosecutor; it has nothing to do with special prosecutors or assistant prosecutors. And § 776.18 gives a prosecutor broad discretion to appoint assistants, providing, at the time of petitioner's trial: "The prosecuting attorney may, under the direction of the court, procure such assistance in the trial of any person charged with a felony as he may deem necessary for the trial thereof . . . ." MICH. COMP. LAWS § 776.18 (prior to 2012 amendment).[8] In any event, whether the assistant prosecutor was properly appointed to serve as an assistant in the Montmorency County prosecution is a question of state law, not cognizable on habeas review. *See Newman v. Nagel*, No. 94-1296, 1995 WL 417636, at *1 (7th Cir. July 13, 1995); *cf. Smith v. Dretke*, No. 3-06-CV-0144-N, 2006 WL 2042612, at *3 (N.D. Tex. July 21, 2006) (whether trial judge had been properly appointed and sworn raised a question of state law).

Further, petitioner cannot obtain relief based on his claim that the preliminary examination was void because the assistant prosecutor had not been sworn in at the time the examination was conducted. There is no general constitutional right to a preliminary examination before trial. *See Gerstein v. Pugh*, 420 U.S. 103, 125 n.26 (1975); *Harris v. Neil*, 437 F.2d 63, 64 (6th Cir. 1971). Thus, a state court's failure to even hold a preliminary examination does not present a cognizable habeas claim. *See Scott v. Bock*, 241 F. Supp. 2d 780, 793 (E.D. Mich. 2003) (Lawson, J.). Further,

---

[8]As amended in 2012, the statute dispenses with any role for the court's discretion.

it is an "established rule that illegal arrest or detention does not void a subsequent conviction." *Gerstein*, 420 U.S. at 119 (citing *Frisbie v. Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886)). Thus, "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." *Gerstein*, 420 U.S. at 119. Because petitioner is now incarcerated pursuant to a valid conviction, he cannot challenge the preliminary procedures employed prior to his trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.     *Recommendation Regarding Certificate of Appealability*

    1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial

showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also deny petitioner a certificate of appealability.  With respect to petitioner's collateral

estoppel claim, is clear from the trial judge's ruling in the Grand Traverse County case that the dismissal of the charges was based on the judge's determination that the prosecution could not prove beyond a reasonable doubt that the Grand Traverse County acts occurred in 2002, in light of the victim's insistent testimony that they occurred in 2003. It is also clear that there is no clearly established federal law establishing that a credibility finding with respect to a witness's testimony on a different matter constitutes a determination of an "ultimate fact" to which the collateral estoppel aspect of the Double Jeopardy Clause is applicable. It is thus not reasonably debatable that the Michigan Court of Appeals's rejection of petitioner's collateral estoppel claim was a reasonable application of clearly established law. With respect to petitioner's remaining claims, as discussed above it is beyond dispute that those claims raise issues of state law that are not cognizable on habeas review, and thus the resolution of these claims is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of

31

appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 5/22/12

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and   by electronic means or U.S. Mail on May 22, 2012.

s/Eddrey Butts
Case Manager

32